IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KARMYNDY SCHNARS,<br>        Plaintiff<br>v.<br><br>WALDAMEER PARK. INC. d/b/a<br>WALDAMEER PARK & WATER<br>WORLD,<br>        Defendant. | C.A. No. 22-118 Erie<br><br>**District Judge Susan Paradise Baxter** |

## MEMORANDUM OPINION

### I.   INTRODUCTION

#### A.   Relevant Procedural History

Plaintiff Karmyndy Schnars brings this action against Defendant Waldameer Park, Inc. d/b/a Waldameer Park & Water World, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. C.S. § 955(a), et seq. Plaintiff initiated this action by filing a complaint on April 4, 2022, and subsequently filed an amended complaint on July 27, 2022, and a second amended complaint on October 4, 2022 [ECF No. 22], which is the operative pleading in this case.

In her second amended complaint, Plaintiff sets forth three counts: Count I asserts a claim of hostile work environment under Title VII, alleging instances of sexual harassment by a non-supervisory co-worker; Count II asserts a claim of retaliation under Title VII, alleging that her hours were reduced and she received a verbal warning regarding her attitude towards guests following her internal complaint of the alleged sexual harassment; and Count III asserts a claim under the PHRA.

After the close of discovery, Defendant filed a motion for summary judgment on all

claims [ECF No. 33]. Plaintiff has filed a brief in opposition to Defendants' motion [ECF No. 37], to which Defendant has filed a reply brief [ECF No. 39]. This matter is now ripe for consideration.

### B.    Relevant Factual History[1]

Plaintiff was 16 years old when she was hired to work for Defendant in June 2020 as a seasonal games operator, after being interviewed by Defendant's Games Manager, Jeremy Mientkiewicz ("Mientkiewicz"). (ECF No. 35, at ¶¶ 1, 3). During the 2020 season, Plaintiff and Jared Junker ("Junker") worked together as games operators in the arcade and they became friends. (Id. at ¶ 19-20; ECF No. 35, at ¶ 7). Plaintiff had no problems with or complaints about Junker during the summer season of 2020, as the two would go with other friends to amusement parks like Cedar Point and drive around Erie together. (ECF No. 31, at ¶ 20). Plaintiff and Junker remained friends following the close of the 2020 park season and communicated with each other primarily through Snapchat. (ECF No. 35, at ¶ 8).

In or around November, at Junker's request, Plaintiff messaged another girl via Snapchat to tell her to stop bullying Junker. (ECF No. 31, at ¶ 21). The girl and her parent went to Junker's house and demanded Plaintiff's address, which Junker gave them. (Id.). According to Plaintiff, the girl then started sending her threats, so Plaintiff "thought [Junker] was a bad friend at the time." (Id.). On or about November 21, 2020, Plaintiff sent Junker a profane Snapchat message about the incident, telling him to "fuck off" and purporting to end their relationship. (Id. at ¶ 22).

Plaintiff testified that she received harassing Snapchat messages from Junker after this incident but before the beginning of the 2021 park season, in which Junker allegedly called her

---

[1] The factual history set forth herein is primarily derived from Defendant's concise statement of material facts [ECF No. 31], and Plaintiff's concise statement of material facts precluding summary judgment [ECF No. 35] to the extent such facts are undisputed by the opposing party and/or are fully supported by the record evidence.

names and recounted the incident with the girl. (Id. at ¶ 23). On or about January 9, 2021, Plaintiff sent Junker profane messages regarding statements she believed he had made about her talking to older men, demanding that he "SHOW ME SS [screenshots] U FAT ASS" to prove his statements. (Id. at ¶ 24). At that point, in January 2021, the friendship ended and Plaintiff admitted being very upset with Junker, while Junker "blocked" Plaintiff on social media and blocked her cell phone number. (Id. at ¶¶ 24-25). Nonetheless, on April 7, 2021, Plaintiff followed Junker on Instagram. (Id. at ¶ 26). In addition, Plaintiff alleges that an anonymous Snapchat account she believes was run by Junker requested nude photographs of her; however, she blocked the account and sent nothing. (Id. at ¶ 27). The last electronic communications between Plaintiff and Junker occurred prior to the 2021 park season. (Id. at ¶ 28).

Plaintiff returned to work for Defendant as a games operator during the summer of 2021, while Junker also returned to work for Defendant during the same season as a ride operator. (Id. at ¶¶ 31-32; ECF No. 35, at ¶¶ 11-12). Mientkiewicz was responsible for creating the weekly schedule for games operators, while the ride operators' schedule was created by Defendant's Ride Operations Manager, Amanda Primett ("Primett"). (ECF No. 35, at ¶¶ 5, 13). Mientkiewicz was also responsible for game assignments, and it was common for games operators to be moved around to different games. (Id. at ¶ 15).

In early June 2021, Junker approached Plaintiff while she was operating a game and told her he wanted to be friends again, but she said no. (Id. at ¶ 16; ECF No. 31, at ¶ 33). The only other personal interactions between Plaintiff and Junker during the 2021 season occurred as they passed by one another on two or three occasions when, according to Plaintiff, Junker would call her names like "whore," "bitch," or "liar," which was not witnessed by anyone else. (Id. at ¶¶ 17-18; ECF No. 31, at ¶¶ 33-34).

3

During the 2021 park season, there were no direct Snapchat messages between Plaintiff and Junker; rather, there were only Snapchat messages from others reporting what Plaintiff and Junker allegedly said about each other, and such messages would not have been sent during Plaintiff's working hours due to Defendant's policy prohibiting the use of cell phones at work. (ECF No. 31, at ¶¶ 35-36). At no time during Plaintiff's employment with Defendant did she provide or show any supervisor or manager any text or Snapchat message, electronic communication, or social media post from any other person. (Id. at ¶ 52).

Before reporting to work on June 11, 2021, Plaintiff sent an email to Mientkiewicz stating as follows:

> I don't necessarily know if you can do anything about this but Jared Junker has been harassing me. Last year we got into a fight I don't even know what it was about to be honest but he was hearing that I was talking to older men apparently so he spread[] rumors about that, he also has created multiple accounts trying to get nudes from me and harass me. And of course I blocked him. In the past a girl was also trying to harass him and I stuck up for him, and he sent the girl my address trying to get her to do things to me. Not only that but he has told multiple people that I have got fired, on the Waldameer's "Do not rehire list" which is odd cause I work the next two weeks including my birthday, but I don't think he unders[tands] I see him run past me every day. He also says that I had to be taken out by security because I sexually harassed a comet worker last year, which I think is kinda funny. There is so much more I can state about this situation but...I have been trying to ignore it but it's honestly getting quite annoying and I shouldn't have to even deal with it at this point. I'm just asking if you can do anything about it at this point, if not it's fine.

(Id. at ¶ 55; ECF No. 38-3, at p. 1).

After Plaintiff reported to work on June 11, 2021, Mientkiewicz had a private conversation with her regarding the email she had sent him earlier that day, during which Plaintiff told Mientkiewicz that she was uncomfortable with the situation and didn't want to speak to Junker or have him near her. (Id. at ¶ 60; ECF No. 35, at ¶ 22). Mientkiewicz told Plaintiff that he would take her complaint to Defendant's President and General Manager, Steve

4

Gorman ("Gorman"); that he would speak with Junker; and that she should let him know if she had any further conversations or communications with Junker. (Id. at ¶ 61). Mientkiewicz then spoke with Gorman about Plaintiff's email and Gorman instructed him to discuss the matter with Junker's supervisor, Primett, and to follow up with Plaintiff. (Id. at ¶ 62; ECF No. 35, at ¶ 26). Mientkiewicz then met with Primett and showed her Plaintiff's email, at which time they agreed that Primett should speak to Junker. (Id.).

Primett and an assistant Rides Supervisor met with and interviewed Junker on June 11, 2021. (Id. at ¶ 63). Junker confirmed that he and Plaintiff had been friends the previous summer, but were no longer friends; that he had essentially stopped communicating with her on any consistent basis since January 2021; and that they had no significant interaction at work or socially. (Id.). Primett instructed Junker to keep his distance from Plaintiff and suggested alternative places for him to eat his lunch and avoid seeing Plaintiff in the employee breakroom. (Id.; ECF No. 35, at ¶ 31). Primett then reported back to Gorman that she had instructed Junker to keep his distance from Plaintiff, and they agreed that Primett would try to schedule Junker to operate rides located away from the games area as much as possible. (Id. at ¶ 64; ECF No. 35, at ¶¶ 32-33).

Later the same day, following his conversation with Primett, Gorman met with Junker personally to tell him he had been made aware of Plaintiff's complaint and to direct him to avoid having any contact with Plaintiff. (Id. at ¶ 65). Gorman then met with Plaintiff on the same day and told her that he had met with Junker and that she should report to him immediately regarding any instances of Junker having contact with her. (Id. at ¶ 66). Gorman also informed Plaintiff that he would have Junker placed in another location away from her and that if she had safety concerns she could follow up with the Millcreek Police Department. (ECF No. 35, at 44; ECF

5

No. 32-1, at p. 56 (internal p. 133)).

After her June 11, 2021 email complaint, Plaintiff and Junker did not have any personal contact with each other, and her exposure to Junker at work was limited to Junker allegedly looking at her from certain rides or walking out of work with others at the same time as Plaintiff. (ECF No. 31, at ¶¶ 87-88). With Defendant's approval, Junker began parking in a separate parking lot so that he would not encounter Plaintiff or her father in the employee parking lot at the end of the workday. (Id. at ¶ 89). Junker also began taking later lunch breaks to avoid running into Plaintiff and, if Plaintiff was in the breakroom, he went to another area during his break. (Id. at ¶ 90). In addition, Junker stopped attending weekly employee after-hours "Ride Nights" in an effort to stay away from Plaintiff, and only resumed attending when the Games Department was not included. (Id. at ¶ 93).

At the end of June or early July, Gorman met with Plaintiff's father, Michael Schnars ("Mr. Schnars"), at Mr. Schnars' request, to discuss Plaintiff's complaint and concerns. (Id. at ¶ 78; ECF No. 35, at ¶ 58). At that time, Mr. Schnars showed Gorman a text message Plaintiff had received from Junker stating, in pertinent part, that he (Junker) "just got told jay only likes you because you are short, and apparently he (Jay) told Alex that he wanted to pound you in the … Waldameer family restroom…." (ECF No. 35, at ¶ 59; ECF No. 41-1, at p. 69). Jay was an employee hired by Defendant to clean the bathrooms at the park. (Id. at ¶ 61). Gorman advised Mr. Schnars to contact police if Junker contacted or harassed Plaintiff outside of the park or via social media outside of work hours. (ECF No. 31, at ¶ 77). Gorman also told Mr. Schnars that he would try to keep Junker in an area of the park away from the games. (ECF No. 35, at ¶ 64).

On or about July 15, 2021, Plaintiff reported to Mientkiewicz that she saw Junker at Cedar Point amusement park when she was there on July 14, 2021, which was a Wednesday, the

day of the week when Waldameer is closed. (ECF No. 31, at ¶ 81). Plaintiff and Junker did not interact at Cedar Point, but Junker took a seat on a roller coaster ride right behind Plaintiff. (Id. at ¶ 82; ECF No. 35, at ¶ 77). Mientkiewicz reported the incident to Gorman who then interviewed Junker about the matter. (Id. at ¶ 83). Junker informed Gorman that he had a season pass to Cedar Point and went there most Wednesdays when Waldameer was closed; thus, Gorman concluded that it was unlikely Junker had followed Plaintiff to Cedar Point. (Id. at ¶ 84).

Plaintiff worked until her seasonal employment ended with the conclusion of the 2021 park season on September 6; she was not terminated because of her complaints, her duties were not changed, and she received an end-of-season bonus. (ECF No. 31, at ¶ 94). However, an end of the season report contained the following notation regarding Plaintiff: "Caused a lot of issues/drama. Trash talked red shirts to other red shirts. Terrible attitude." (ECF No. 35, at ¶ 102, 104; ECF No. 38-3, at p. 22). Plaintiff never reapplied for seasonal or full-time employment with the Defendant after the 2021 season and, thus, was never denied reemployment. (Id. at ¶ 102).

## II. DISCUSSION

### A. Count I – Hostile Work Environment

In order to state a claim of hostile work environment under Title VII, a plaintiff must show: "(1) that [she] suffered intentional discrimination because of [her] sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [her]; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability." Mandel v. M&Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013). Here, Defendant argues that Plaintiff cannot meet her burden of establishing a *prima facie* case of hostile work environment because the evidence of record falls short of meeting the requisite "severe or pervasive" standard and/or establishing the existence of

*respondeat superior* liability as a matter of law.

With regard to the "severe or pervasive" standard, the Third Circuit has clarified that "the distinction means that 'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." Castleberry v. STI Group, 863 F.3d 259, 264 (3d Cir. 2017) (citation internal quotation marks omitted).

In Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001), the Supreme Court established a framework for analyzing the "severe or pervasive" prong:

> [H]arassment is actionable under Title VII only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment. Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

(internal citations and quotation marks omitted).

In evaluating a hostile work environment claim, the Court is mindful that "offhanded comments, and isolated incidents (unless extremely serious)" are generally not sufficient to sustain a hostile work environment claim. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Rather, the "conduct must be extreme to amount to a change in the terms and conditions of employment...." Id. Additionally, the environment must be objectively hostile, not only hostile in the plaintiff's view. Breeden, 532 U.S. at 270-71.

Here, the actions of Junker upon which Plaintiff bases her claim fall far short of establishing a hostile work environment. In fact, a number of the actions cited by Plaintiff are based on her own conjecture and misapprehension, rather than established fact. For instance, Plaintiff claims that Junker "followed her" a few hundred miles to Cedar Point; however, the

8

record shows that Junker had a season pass to Cedar Point and went nearly every Wednesday during the summer, and that one of those Wednesdays happened to coincide with a day Plaintiff was there. There is no evidence that Junker "followed her" there. More importantly, this activity occurred away from the workplace and could not have contributed to the creation of a hostile work environment.

In addition, Plaintiff's claim that Junker stated that he wanted to rape her in Waldameer's public bathroom is not supported by the record evidence. At her deposition, Plaintiff testified that she based this claim on a statement Junker made to their mutual friend "Simeon." (ECF No. 32-1, at pp. 59-67 (internal pp. 159-167)). This statement is memorialized in the following text exchange between Plaintiff and Simeon in which Plaintiff asked Simeon to share with her what he was told by Junker:

| | |
|---|---|
| Plaintiff: | What did he (Junker) say exactly(?) I need that plz |
| Simeon: | I seriously don't know exactly what he said. All I know is that he (Junker) told me that he heard from one of his friends that he wanted to fuck you. Well he did say the word rape. But regardless it would be rape even if he didn't say the word rape. And it was Jay. I remember that name. |
| Plaintiff: | He said he wanted to rape me in the Waldameer bathroom. Yep. Thank U. |
| Simeon: | Yeah that's all I know tho |

(ECF No. 38-3, at pp. 11).

Simeon's recollection of Junker's statement corresponds with Plaintiff's prior text/Snapchat exchange with Junker:

| | |
|---|---|
| Junker ("Hared"): | Alex just told me more of his thoughts over the past few months. It's so disturbing that I nearly almost broke my transmission while I was driving home. |

| | |
|---|---|
| Plaintiff: | I would. |
| Junker: | Do you wanna know? |
| Plaintiff: | Sure. |
| Junker: | So apparently I just got told jay only likes you because you are short, and apparently he told Alex that he wanted to pound you in the ... Waldameer family restroom. And I am now the only person who knows. I lost my shit when I heard the second one of those. |

(ECF No. 32-12, at p. 2).

In each of the foregoing message exchanges, it is readily apparent that Plaintiff was told that "Jay," not Junker, stated that he wanted to rape ("pound") her in the Waldameer bathroom; yet Plaintiff inexplicably cited her exchange with Simeon as evidence that it was Junker who said that he intended to rape her in the Waldameer bathroom. (ECF No. 32-1, at p. 60 (internal p. 160)). When asked to explain her reasoning, Plaintiff testified that "I was assuming that Simeon, like he heard from one of his friends that Jared said that he wanted to fuck me." (Id. at p. 63 (internal p. 163)). However, this explanation stretches the bounds of credulity, especially in light of the fact that Plaintiff prefaced her question to Simeon by asking for clarification of "how he (Junker) said Jay aka Insane roller coaster junkie was going to rape [her] in the bathroom." (ECF No. 38-3, at pp. 10). Given the plain language of the exchange between Plaintiff and Simeon, which is further buoyed by Plaintiff's prior exchange with Junker, the Court finds that no reasonable factfinder would agree with Plaintiff's interpretation that Junker said he wanted to rape her in Waldameer's bathroom. At most, it appears that Junker was responsible for spreading the rumor that his friend, Jay, had said that he wanted to rape Plaintiff in Waldameer's family restroom, and that Junker did so outside of the workplace.

In addition, Plaintiff argues that "[t]he record shows that Junker repeatedly called [her] a "bitch" and a "whore" both at work and over social media;" however, Plaintiff testified that such

10

instances occurred only two or three times at the workplace "in the middle of 2021" while Junker was walking with his friends (ECF No. 37, at p. 4; ECF No. 32-1, at p. 31, 33 (internal pp. 81, 83)). Plaintiff testified further that she had no other verbal communications with Junker during the 2021 season, other than their initial encounter when Junker told her he wanted to be friends again and she declined. (ECF No. 32-1, at p. 36 (internal p. 86)). Plaintiff also testified that Junker was telling others that she "was a whore and stuff like that," though she had no firsthand knowledge of such communications and was unable to provide names of the other people to whom he spoke or the number of times such comments were made. (Id. at pp. 30, 37 (internal pp. 80, 87)).

"With respect to the issue of pervasive conduct, courts in this Circuit have been steadfast in finding that 'general, unsubstantiated allegations that the alleged conduct occurred 'regularly' or 'all the time' are insufficient to defeat summary judgment." Norris v. NLMK Pennsylvania, LLC, 2022 WL 11264627, at *13 (W.D. Pa. Oct. 19, 2022), quoting Nitkin v. Main Line Health, 2021 WL 4860742, at *11 (E.D. Pa. Oct. 18, 2021); see also Collins v. Kindred Hosps. E., LLC, 2016 WL 4264588, at *14 (W.D. Pa. Aug. 12, 2016) (explaining that "[g]eneral claims that there were a lot of incidents [of harassment] are insufficient where the plaintiff did not testify about the specifics of the general claim"). Instead, a plaintiff must describe specific instances of misconduct, and courts will look only to identified specific events when determining whether a material issue of fact exists. See Bumbarger v. New Enterprise Stone & Lime Co, Inc., 170 F.Supp.3d 801 (W.D. Pa. 2016) (declining to credit the plaintiff's unsubstantiated assertion that her harasser sexually propositioned her more than 100 times and had touched her inappropriately more than 50 times and noting that the plaintiff only identified two specific instances of touching—one where he grabbed her and one where he squeezed her shoulder); Nitkin, 2021 WL

4860742, at **11-12 (considering only the seven incidents that plaintiff described in her deposition testimony on summary judgment despite the fact that plaintiff had also represented that "she would be unable to recount every single time [a supervisor] made sexually inappropriate comments during the weekly team meetings 'because there were so many'"); .

Even accepting Plaintiff's testimony as true, the totality of circumstances supported by the record fails to establish that Plaintiff was subjected to sexually harassing conduct that was severe or pervasive in the workplace. See, e.g., Bumbarger, 170 F.Supp.3d at 827 (finding conduct not severe or pervasive where the plaintiff was called "bitch" and "cunt" and her supervisor had "mooned" her); Norris, 2022 WL 11264627, at *15 (finding that conduct was not severe or pervasive where the plaintiff was called "bitch," "cunt," and "whore" in the workplace by her co-workers, an explicit picture was found near plaintiff's locker, several of plaintiff's personal items were destroyed or removed, and several sarcastic and/or sexist Facebook posts by certain employees referenced the plaintiff by name).[2] Thus, the Court will grant summary

---

[2] See also Dreshman v. Henry Clay Villa, 733 F.Spp.2d 597, 602 (W.D. Pa. 2011) (granting employer summary judgment where plaintiff, a former male stripper, alleged that he was verbally harassed and subjected to sexually charged comments from co-workers, propositioned for a lap dance by a co-worker, and inappropriately touched by co-workers on five occasions); Saidu-Kamara v. Parkway Corp., 155 F.Supp.2d 436, 439-40 (E.D. Pa. 2001) (granting employer summary judgment where plaintiff asserted her supervisor assaulted her, made suggestive comments, and propositioned her on multiple occasions); Obergantschnig v. Saw Creek Estates Community Ass'n, Inc., 2013 WL 5676328, at *7 (E.D. Pa. Oct. 18, 2013) (granting employer summary judgment where plaintiff alleged that a co-worker rubbed her shoulders and put his hands around her waist, asked her out on dates, spread rumors that she had sexual relations with a supervisor and had been a "hooker in New York," and called her a "slut," whore," and c**t"); Jankowski v. Sage Corp., 2010 WL 1253542 (W.D. Pa. Mar. 24, 2010) (granting employer summary judgment where plaintiff alleged her supervisor touched and/or rubbed her back and shoulders on two occasions, "brushed up on her" on four occasions, and implied that she could satisfy him more than his wife); Fahnbulleh v. Carelink Cmty. Support Servs., Inc., 2009 WL 4591712, at *1 (E.D. Pa. Dec. 4, 2009) (granting employer summary judgment where plaintiff alleged that she was subjected to sexually inappropriate comments and one incident during which a co-worker touched her back, shoulder, and breast over a two-month period); Willauer v. Riley Sales, Inc., 2009 WL 2959822, at *1 (E.D. Pa. Sept. 16, 2009) (granting employer summary judgment where plaintiff alleged that her supervisor complimented her on her shirts and stared at her breasts between 10 and 15 times over the course of one year, scribbled plaintiff's name numerous times on a piece of paper, suggested that she stay in a hotel room with her, and watched her change into a bathing suit).

judgment in favor of Defendant on this claim.[3]

### C.     Count II – Retaliation

Claims of retaliation under Title VII are analyzed under the McDonnell Douglas burden-shifting framework. Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006). Under this framework, a plaintiff must first establish a *prima facie* case of retaliation under Title VII, by showing that: (1) she was engaged in prior protected activity; (2) the employer took adverse employment action after or contemporaneous with the plaintiff's protected activity; and (3) a causal connection exists between the plaintiff's protected activity and the employer's adverse action." Id., 461 F.3d at 340-41. If the plaintiff establishes a *prima facie* case of retaliation, then the burden shifts to the employer to provide a legitimate, non-retaliatory reason for its conduct. Id. at 342. If it does so, the burden then shifts back to the plaintiff "to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Id. (internal quotation marks and citation omitted). Thus, the plaintiff must ultimately prove that her employer's retaliatory animus was the cause or, put differently, the "real reason," for the adverse employment action. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000) (using the term "real reason" to describe the plaintiff's ultimate burden at the pretext stage)

Here, Defendant argues that Plaintiff has not satisfied the second prong of her *prima facie* case because she cannot meet her burden of establishing that she suffered a materially adverse employment action. Plaintiff counters that she was subjected to a materially adverse action by virtue of Defendant's end of the year report in which she "was documented as having a terrible

---

[3] Because the Court has found that Plaintiff has failed to meet her burden of proving the second prong of her *prima facie* case of hostile work environment, there is no need to address Defendant's other bases for entering summary judgment on such claim.

attitude, causing drama, and trash talking red shirts." (ECF No. 37, at p. 21).[4] Plaintiff contends that a jury could conclude that being "labeled as a bad employee in [Defendant's] personnel records … would be enough to discourage other workers from filing sexual harassment complaints against co-workers." (Id.). The Court disagrees.

A materially adverse employment action is any action taken by an employer that "well might have dissuaded a reasonable worker from [engaging in protected activity]." Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). In the context of this case, Plaintiff must produce "facts from which it could be inferred that the unfavorable performance review adversely affected the terms or conditions of her employment." Clark v. Philadelphia Housing Auth., 701 Fed. Appx. 113, 117 (3d Cir. 2017), citing Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001), *abrogated on other grounds by* Burlington N. and Santa Fe Ry. Co., 548 U.S. 553 (2006). Plaintiff has failed to do so.

In fact, the record indicates that despite the negative comments in Defendant's end-of-season report, Plaintiff still received her end of the year bonus and never received a written warning or reprimand. She also has provided no evidence demonstrating that the negative comments adversely affected the terms and conditions of her employment or her ability to obtain future employment. Thus, Plaintiff has failed to show that her negative performance review at the end of the 2021 season was a materially adverse employment action sufficient to satisfy the second prong of her *prima facie* claim of retaliation. See, e.g., Weston, 251 F.3d at 431 (finding that the plaintiff failed to establish that two written reprimands were materially adverse employment actions because he "suffered no reduction in pay, reassignment, firing, or any

---

[4] In her second amended complaint, Plaintiff also alleges that her "hours were reduced in half" (ECF No. 22, at ¶ 15); however, it appears that Plaintiff is no longer pursuing this argument.

14

similar employment action"); Clark v. Philadelphia Housing Auth., 701 Fed. Appx. 113, 117 (3d Cir. 2017) (finding the plaintiff failed to allege any facts that suggested that negative statement in her performance review somehow adversely affected the terms or conditions of her employment); Ponton v. AFSCME, 395 Fed. Appx. 867, 874 (3d Cir. 2010) (finding negative performance evaluation "did not constitute a materially adverse action inasmuch as [plaintiff] received an overall rating of 'satisfactory,' the highest rating available"); Anderson v. Pennsylvania State Police, 2015 WL 2213563, at *22 (M.D. Pa. May 11, 2015) (finding overall satisfactory rating with negative commentary was not materially adverse employment action in the absence of evidence explaining how such commentary "affected, or could have affected, [plaintiff's] employment status, including her prospects for promotions and future employment" and in light of evidence indicating that she was "not at all penalized for said ratings or commentary"); Hallman v. PPL Corp., 2014 WL 349714, at *11 (E.D. Pa. Jan. 31, 2014) (finding negative performance evaluation insufficient to establish materially adverse employment action).

For the foregoing reasons, the Court finds that Plaintiff has failed to establish a *prima facie* claim of retaliation under Title VII and, thus, summary judgment will be entered in favor of Defendant on such claim.

### C.     Count III – Violations of the PHRA

Count III of the second amended complaint alleges that Defendant discriminated and retaliated against Plaintiff in violation of her rights under the PHRA.

The analysis of employment discrimination and retaliation claims under Title VII and PHRA is coextensive and courts typically interpret the PHRA in accord with its federal counterpart. See Kelly v Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996), citing Gomez v.

Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995) (noting that the PHRA and Title VII are interpreted similarly). Thus, for the same reasons already set forth at length above with regard to Plaintiff's Title VII claims, summary judgment will be entered in favor of Defendant on Plaintiff's discrimination and retaliation claims under the PHRA.

    An appropriate Order follows.